466 F.2d 830
 William COUSINS, Jr., et al., Plaintiffs-Appellants,
Mary Lee Leahy, Intervenor-Appellant,
v.
CITY COUNCIL OF the CITY OF CHICAGO, Richard J. Daley,
individually and as Mayor of the City of Chicago,
and Board of Election Commissioners of
the City of Chicago,
Defendants-Appellees.
 No. 71-1077.
 United States Court of Appeals,
Seventh Circuit.
 May 25, 1972.
Rehearing Denied June 23, 1972.
As Amended June 30, 1972.
Certiorari Denied Oct. 10, 1972.
See 93 S.Ct. 85.
 
 Michael L. Shakman, Thomas N. Todd, Robert Plotkin, Chicago, Ill., for plaintiffs-appellants.
 Richard L. Curry, Edmund Hatfield, Gayle L. Haglund, Earl L. Neal, William R. Ming, Jr., Aldus S. Mitchell, Howard M. Miller, Andrew M. Raucci, Chicago, Ill., for defendants-appellees.
 Before FAIRCHILD, CUMMINGS and STEVENS, Circuit Judges.
 FAIRCHILD, Circuit Judge.
 
 
 1
 On November 6, 1970 the city council, Chicago's legislative body, enacted a redistricting ordinance dividing Chicago into fifty wards. The city council is composed of aldermen, one elected from each ward for a four year term. Aldermen were elected February 23, 1971, under the redistricting ordinance, and are now serving. Plaintiffs in this case challenge the validity of the ordinance on the grounds that it embodies racial and political gerrymandering in violation of federally protected rights and that the wards are not compact, as required by an Illinois statute, S.H.A. ch. 24, Sec. 21-36. The action was begun and decided in the district court, and an appeal taken, before the February 23, 1971 election.
 
 
 2
 I. History of the litigation.
 
 
 3
 Litigation seeking redistricting of Chicago began in 1966. Plaintiffs Sherman H. Skolnick and others challenged the districts as drawn in the 1961 ordinance for deviation from one person-one vote standards. In 1968 the district court found deviations in terms of the 1960 census to an impermissible degree, enjoined further general elections under the 1961 ordinance and required a new districting ordinance, based on 1970 census figures, to be enacted and filed by November, 1970. Except for one modification, advancing the deadline and no longer significant, this court affirmed.[1]
 
 
 4
 On November 14, 1970, after hearing, the district court held the November 6, 1970 ordinance constitutional.[2]
 
 
 5
 On appeal, this court affirmed, but limited our affirmance to rejection of the claim that the districts did not yet come close enough to exact equality of population. In an unreported order, entered December 14, 1970, we said:
 
 
 6
 "We conclude that, considering the ordinance from the point of view of mathematical precision alone, the district court's decision that the ordinance fulfills the required standards (Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, and Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519), is to be affirmed.
 
 
 7
 "The appellants and the Chicago Bar Association assert that as late as the hearing date the district judge should have permitted the filing of an amended complaint and should have permitted several aldermen to realign themselves as plaintiffs and other Chicagoans to become plaintiffs. These parties claim in substance that notwithstanding the close approximation to precise equality of the wards presented by the ordinance, the ordinance is invalid by reason of alleged gerrymandering which could dilute the voting strength of racial, political and religious groupings of people. Although the district court on its own motion gave some thought to whether this might be true and concluded after examining offers of proof that there was 'no evidence' of racial and 'no substantial evidence' of political gerrymandering, it cannot be said that the claims of gerrymandering advanced by the appellants were fully litigated or decided on their merits.
 
 
 8
 "Since these claims were not fully litigated by the parties and since some parties appear to interpret the judgment as deciding them, we consider it appropriate to declare expressly in this order that consideration of the gerrymandering issue has not been foreclosed by the district court's judgment, which we now affirm, and that appellants or others are free to file a new action if they wish to pursue this issue."
 
 
 9
 On December 22, 1970 plaintiffs filed the complaint in the present case. The February 23 election was imminent, and the district court commendably expedited the case. Hearings began December 29, 1970 and continued, with necessary interruptions, through January 18, 1971. On January 22 the district court filed findings, conclusions, and judgment in favor of defendants. Cousins v. City Council of City of Chicago, 322 F.Supp. 428 (N.D.Ill. 1971).
 
 
 10
 Plaintiffs appealed. We denied their motion to enjoin the election, noting among other things that "the election will not defeat or impair our appellate jurisdiction; should appellants prevail, we would have power to order prompt redistricting and a new election; . . . indeed, it is manifest that the ward boundaries established by the ordinance under attack are to be preferred to the prior boundaries which would be preserved by an injunction."
 
 
 11
 II. The complaint.
 
 
 12
 The complaint alleges that the 1970 ward boundaries operate to dilute the votes and voting strength of important elements of the voting population of Chicago, specifically black voters, voters of Latin-American origin or ancestry, and independent voters; that such dilution was accomplished by drawing unnecessarily irregular ward boundaries and creating wards not compact; that boundaries were drawn as a gerrymander with intent to discriminate against black, Latin-American, and independent voters, and candidates whom they would support; that the wards are not composed of compact territory as required by state law. The gist of the claims as developed at trial and in argument is that the boundaries were drawn so as to minimize the number of wards in which the majority would be black, or would be so-called independent voters, and to avoid having any ward in which the majority would be Puerto Rican.
 
 
 13
 Thirteen plaintiffs are individuals, residents and voters within the city. Five were aldermen who voted against the 1970 districting ordinance. Seven are black and one Puerto Rican. At least ten are so-called independent voters. Party designations do not appear on the ballot, but party organizations often endorse candidates. Plaintiffs refer to independent voters as those who "have frequently voted for and actively supported independent candidates for public office, meaning candidates who are not the candidates of any political party."
 
 
 14
 Two plaintiffs are unincorporated associations: Independent Voters of Illinois, a statewide organization committed to the advancement of independent politics, including the support of independent candidates in Chicago, and Committee for an Effective City Council, committed to the advancement of independent politics in relation to the city council of Chicago.
 
 
 15
 III. The districting created by the ordinance.
 
 
 16
 Printed as part of the opinion is an outline map of Chicago, showing ward boundaries according to the 1970 ordinance
 
 
 17
 The total population of Chicago, shown by the 1970 census at the time the ordinance was enacted (later revised) was 3,329,090. Thus the goal was to draw wards each containing 1/50 of that number, or 66,582. The result very closely approached that goal.
 
 
 18
 The map shows that the shapes of wards are far from perfect geometric symmetry. Wards are required, by an Illinois statute, to "be composed of contiguous and compact territory."[3] In our view there are a number of reasons why perfect symmetry in outline can not be achieved or closely approached.
 
 
 19
 The eastern boundary of the city is, for the most part, the curving shore of Lake Michigan. The other boundaries have substantial irregularities. One north-south dimension is over 26 miles, and one east-west dimension in the central portion less than 7. Within the external boundaries are various natural and man-made barriers and substantial areas without resident population, such as Lake Calumet, rivers, expressways, parks, railroads, and concentrations of industry, all of which could have a bearing on whether a particular ward structure reasonably met the compact territory requirement. Census tracts, which were largely relied upon in the process of districting, vary considerably in area, shape, and number of residents.
 
 
 20
 In considering the plaintiffs' claim, founded on state law, that the wards are not compact. we look for guidance to the Supreme Court of Illinois. In dealing with a requirement that senatorial districts be formed of compact territory, it has said: "There is a vast difference between determining whether the principle of compactness of territory has been applied at all or not, and whether or not the nearest practical approximation to perfect compactness has been attained. The first is a question which the courts may finally determine; the latter is for the legislature."[4] Notwithstanding the irregularities in outline of wards, we could not determine from the present record, if it were our place to do so, that the principle of compactness was not applied at all.
 
 
 21
 Nonetheless, it is our view that when other facts point to a probability that there has been invidious discrimination in drawing ward lines, deviations from maximum compactness may be considered along with these other facts in determining whether such discrimination (violating federal rights) has occurred.
 
 
 22
 At the time of trial, 1970 census figures on racial composition of census tracts were not available, and the evidence at trial tending to show where black people and people of Puerto Rican origin live and the percentage they constituted in various wards was testimony of witnesses, based on various studies. On appeal, we have permitted the parties to file copies of "Racial Composition of Census Tracts, 1970 Census Data" and computations therefrom showing the percentage of the population of each ward which is negro. Using these figures (which to a considerable degree substantiate the estimates made at trial) the following propositions appear:
 
 
 23
 There are 15 wards in which a majority of the residents are negro.
 
 
 24
 There are 13 of those wards in each of which more than 75% of the residents are negro. These wards are in two areas of the city. The 2d ward (91.9% negro) is just south of the downtown business "Loop" area and the 3d (99.0%), 4th (91.1%), 16th (95.3%), 20th (97.4%), 17th (97.6%), 6th (97.3%), 8th (77.8%), and 21st (86.4%) string out toward the south. The 27th ward (89.8%) is just northwest of the "Loop" and the 28th (83.5%), 29th (88.6%), and 24th (98.6%) are west and southwest of the 27th.
 
 
 25
 The eleven wards bordering the south side group have the following percentages of negroes: 1st, which also borders the west side group (35.8%); 5th (57.5%); 7th (26.9%); 10th (9.2%); 9th (28.3%); 34th (66.3%); 19th (2.2%); 18th (28.2%); 15th (8.3%); 14th (6.2%); and 11th (11.3%).
 
 
 26
 The six wards (other than the 1st) bordering the west side group have the following percentages of negroes: 42d (39.2%); 26th (4.7%); 31st (1.4%); 37th (12.5%); 22d (23.4%); and 25th (36.3%).
 
 
 27
 The largest percentage of negroes for any of the other 20 wards is 5.3%.
 
 
 28
 Plaintiffs contend that if the lines had been drawn with indifference to the color of the residents, there would have been more wards with a majority of black people.
 
 
 29
 Testimony at trial tended to show that there are about 80,000 city residents of Puerto Rican origin, most of whom live in the 26th, 31st, and 33rd wards. As the wards were drawn the Puerto Ricans are a substantial minority in each (40- 45% in the 26th, 30-35% in the 31st and 25-30% in the 33rd). The claim is that had the wards been drawn differently, Puerto Ricans might have had a majority in one or possibly two.
 
 
 30
 Plaintiffs produced evidence which they claim tended to show that the voters they refer to as independent live in certain areas and that the ward lines might have been drawn so as to give them a majority in more wards.
 
 
 31
 IV. The drawing of the 1970 ward map.
 
 
 32
 Alderman Thomas E. Keane was chairman of a subcommittee of the Council's Committee on Committees and Rules. The subcommittee conducted public hearings from October 13 to November 4, 1970, with Alderman Keane presiding. On November 5 the full committee adopted the ward map reported by the subcommittee, and on November 6 the council enacted the districting in the form of an ordinance.
 
 
 33
 At the public proceeding before the subcommittee, Alderman Keane worked from a city map showing census tracts. In selecting territory for a ward, he would announce the number of a census tract. Then its population would be announced. Clerks kept a running total for that ward until it reached approximately the ideal one-fiftieth of the city's population. Adjustments were made from time to time, either by shifting census tracts between wards or by dividing them and assigning constituent enumeration districts to different wards. Defendants contend that selection of areas for inclusion in any ward was motivated only by considerations of contiguity, compactness, and obtaining a total population for each ward as close as possible to the ideal.
 
 
 34
 Plaintiffs discovered during the trial, and produced proof, that an earlier and confidential version of a proposed ward map had been prepared in the latter half of September with Alderman Keane's knowledge and approval. Census figures first became available September 10, though subjected to recalculation from time to time thereafter. The earlier map was prepared in the library of Alderman Keane's law office, across the street from the city hall, by city employee Edwin Bell and three university student interns who were paid by the city for this particular project. Although the district court found that preparation of this map was "an academic exercise," we consider the finding clearly erroneous, and that such preparation was at least a trial run for the process later conducted at public hearings. It is important because certain conversations in the course of its preparation showed that race was at least thought about in connection with particular ward lines. A lack of candor concerning the existence and purpose of the Bell-student map detracts nothing from the weight of such evidence.
 
 
 35
 Mr. Bell was deputy chief administrative officer for the Council Committee on Finance, of which Alderman Keane was chairman. Bell was also a lecturer at the University of Illinois Circle Campus. During the spring of 1970, Mr. Bell and Professor Murray of the same university, with the approval of Alderman Keane, had planned a City Council Urban Intern Program, to begin in the fall term, 1970. Three students were selected. On June 29, Alderman Keane had written to the chairman of the department of political science about "the possible appointment of one or more graduate students as legislative interns attached to the Committee on Finance.
 
 
 36
 "I would be pleased to have one or more of your students perform as interns under the direction of Mr. Bell and Dr. Murray. It is understood that these students will perform those research projects and other tasks which are assigned to them by members of my staff."
 
 
 37
 In early September, 1970, the remapping subcommittee, of which Alderman Keane was chairman, was appointed. At that time the court-imposed deadline for enactment of a redistricting ordinance was October 1. Although census figures had been expected by August 1, they were not yet available, but became so (though subject to further revision) September 10. About September 8, after obtaining the approval of Alderman Keane, Bell contacted Murray, and talked again on the 11th. Bell told Murray that the city was engaged in a problem of redistricting, had to get the project finished under a certain time pressure, and that this would be a good project to introduce the students to the internship program. Murray telephoned or telegraphed the students and told them to report to Bell. They worked from about September 17 to about October 1.
 
 
 38
 The work was done in the library of the law office of Alderman Keane, Alderman Wigoda, and their associates. Alderman Keane was in and out and conversed with or in the presence of the student interns. The procedure was similar to that which Alderman Keane later followed in the public hearings, with Bell selecting census tracts for inclusion in a ward, and the student interns performing the clerical tasks of tallying and adding.
 
 
 39
 Mr. Taylor, one of the student interns, testified that Alderman Keane as well as Mr. Bell told them about the importance of redrawing the map, the opportunity they would have to learn something, and that they should not say anything to anybody else; that Bell said that Alderman Wigoda wanted to get rid of certain areas in his ward, but after the lines were drawn the alderman pointed out that they had also cut out one of his favorite precincts, and they restored it; that a committeeman in another ward had sent in notes as to how he wanted his ward drawn; that they worked on the wards around the rim and then inwardly but there were two which were drawn ahead of their turn, Alderman Keane's 31st, and Mayor Daley's 11th.
 
 
 40
 Another student intern, Mr. Kazemek, testified that Bell told them they would be involved in drawing a new ward map for the city; that on one occasion Alderman Keane remarked that "if Alderman Despres were left out of his ward with the redrawing he would scream and holler;" that at the same time Alderman Keane said that regardless of what the map looks like everyone would accuse him of gerrymandering; that at one time Alderman Keane pointed to his own 31st ward and said "That's the key;" that another alderman came in, looked at his ward, and talked to Mr. Bell about it; that Bell told the student interns, "we're trying to have it finished by October 1."
 
 
 41
 Mrs. Eme, the third student intern testified that they were instructed to make the wards as compact as possible and to try to keep all aldermen and committeemen in their wards; that they had lists of addresses of both (which were produced in court); that one day they noticed they had left Alderman Despres out of his ward and Bell redrew the line; that later when Alderman Keane came in he was told of this and laughed and made the remark about a lot of hollering; that Alderman Keane had looked at his own ward; that Alderman Wigoda commented about their leaving out one of his good precincts.
 
 
 42
 The student interns received regular stipends from the university during the academic year and worked on other internship projects after October 1st. The city also paid them for the time they worked on the map, but not for their other work.
 
 
 43
 The census office changed the figures on several occasions while Bell and the student interns were working, and the breakdown into enumeration districts (census units smaller than tracts) never became available to them.
 
 
 44
 On September 25, 1970, the city applied to the district court in the Skolnick case for an extension of the deadline to November 10, pointing out that there were still discrepancies in tract figures requiring recalculation and that enumeration district figures would be required in order to divide tracts. On October 2, the extension was granted. Alderman Despres petitioned this court for a writ of mandamus, which was denied. In the petition filed October 6, it was presciently suggested that the city must already have prepared a reapportionment plan. The city's response was that the suggestion was made of "evanescent stuff."
 
 
 45
 It is true that the Bell-student map did not reach the mathematical precision later reached by the ordinance, but Bell and the student interns worked with such figures as were available at the time, and while the October 1 deadline was still in force.
 
 
 46
 Alderman Keane never testified concerning the Bell-student map. Plaintiffs took his deposition for discovery purposes before they knew about it. Although he was emphatic that the map he used at the public hearings was the only map he used, he did not volunteer the facts about the Bell-student map in answers where such disclosure would have been appropriate. His deposition, though taken for discovery, was offered by defendants and received over plaintiffs' objection. He was not called to testify at trial.
 
 
 47
 Defendants called Mr. Bell, who corroborated much of the student interns' testimony. He testified, however, that the project was an academic project and that Alderman Keane's comments when he saw the work were "Grandfatherly." He testified "The value to be gained [by the students] from the ward map that they drew would come out in terms of the changes in population, in terms of numbers, in terms of the shift in populations. They would see what the configuration of the city looked like."
 
 
 48
 He also testified that the student interns performed a clerical function, and therefore the project was a failure as an academic program. He explained, "When I devised the project, the project, of course, was to be a total involvement project on the part of the interns and myself, and I was to serve as a gatekeeper, more or less, in the performance of the redistribution of the wards. What it ended up with was very close to something that I think most fathers are familiar with when they buy their children a railroad train. They set it up in the livingroom, and they never give the transformer, but they let the kids stand by and watch while the train runs around the track."
 
 
 49
 Professor Murray testified that he had seen Mr. Bell on January 6 shortly after defendants learned that plaintiffs were in touch with or had subpoenaed the students. Mr. Bell "appeared to be quite shaken." With respect to the character of the map as an academic project, "Mr. Bell, to the best of my recollection, stated that that would be a difficult position to take. I am not sure whether he used the word 'difficult' or not, but Mr. Bell suggested that he would not be able to take that position."
 
 
 50
 The district court believed Bell, notwithstanding the impeachment by Murray's testimony, and made a finding, which appears between paragraphs numbered 37 and 38, to the effect that the Bell-student map was an academic exercise. With all respect, and due regard to the opportunity of the trial court to judge credibility, we deem the finding clearly erroneous.
 
 
 51
 We think it clear from all the circumstances that the project on which Bell and the interns were engaged had a serious and substantial purpose for the benefit of the city. The October 1 deadline was approaching, and until it was extended, no one could know whether and for how long it would be extended. It would only make good sense to have on hand a map produced with the best figures available. In the public hearings when Alderman Keane began the process of selecting census tracts for inclusion in particular wards, he did not completely follow the Bell-student map, but did often appear to make similar choices. He proceeded with reasonable assurance that the method he was following would produce a result, and it seems doubtful that he could have had such assurance without preliminary work. At the very least, the Bell-student project was a trial run for the task later performed at the public hearings.
 
 
 52
 V. The findings and evidence with respect to considerations of race.
 
 
 53
 The crucial findings of the district court with respect to claims of racial gerrymandering are contained in paragraphs numbered 19, that census data were the sole basis for shaping of wards; 30, that the determination was not based on information of racial or ethnic distribution; 32, that there is no evidence that the council intended to dilute the vote of black people or other ethnic groups; and 33, that the 1970 ward map did not have the effect of such dilution.
 
 
 54
 Since these findings disposed of claims of infringement of fundamental constitutional rights, though not infringement directly of first amendment rights, we think our duty on appeal is to subject the findings to specially close scrutiny.[5] As will be stated in more detail, we think there is substantial evidence tending to show that Alderman Keane considered the race of residents at least with respect to particular lines and areas, and, since he directed the drawing of the map and made the choices of territory, it seems fair to impute his consideration to the council in its enactment of the ordinance. Although we are not prepared to measure, on this record, any discriminatory effect which may have resulted, we think that the findings must be set aside until the question has been more fully explored in the district court.
 
 
 55
 We summarize in the following paragraphs the evidence offered to show that race was considered in drawing the map:
 
 
 56
 Conversations concerning the 7th ward.
 
 
 57
 The new 7th ward has 26.9% black residents, according to the census figures filed in this court. It lies between Lake Michigan and the 8th ward, which has 77.8% black residents.
 
 
 58
 The former 7th ward, under the 1961 ordinance, extended somewhat farther north and not as far south, and was believed to have between 55 and 60% black residents. It was served by Alderman Bohling, who is white. Mr. Taylor testified that "Mr. Bell wanted to be able to keep Alderman Bohling in the 7th ward."
 
 
 59
 The Bell-student map contained a 7th ward which would, according to census figures, have 29.4% black residents. At the subcommittee hearings, the ward was re-drawn several times. At one stage Tract 4603, which has a population of 8,885, 93.3% white, was included in the 8th ward, represented by Alderman Cousins, a plaintiff here, who is black. Alderman Keane shifted Tract 4603 into the 7th ward, offsetting that by a shift of predominantly black tracts from the 7th to the 8th, remarking to Alderman Cousins about Tract 4603, "I understand they have a lot of Polish voters over here, and you don't want to represent them". Alderman Keane testified he did not recall this statement.
 
 
 60
 It must be said that putting Tract 4603 into the 7th ward, tended to make that ward more compact. If the statement was made, however, it indicated at least awareness of the racial composition of the area being transferred, although we do not suggest that proof of awareness alone would establish invidious discrimination.
 
 Conversation about the 31st ward
 
 61
 The 31st ward is represented by Alderman Keane. Its present population is 1.4% black, according to census figures, and 30-35% Puerto Rican according to testimony at trial. The present (1970) north and south boundaries are the same as on the 1961 map, except in length and except for an irregular boundary near the east end of the south boundary. Tracts 2306 and 2313, now included at the west end were not part of the ward on the 1961 map, and Tract 2425 and part of 2426 are not now included although they were part of the southeast corner of the ward on the 1961 map. Puerto Ricans live in the eastern portion of the ward, in the portion eliminated in 1970, and to the north, east, and south of the east end of the ward. Adding territory to the west of the 1961 ward resulted in a lower percentage of Puerto Ricans than if territory to the east had been added.
 
 
 62
 Taylor testified that at one point while the 31st ward was being drawn, "I had suggested a tract that would have brought the figure up to the required number, and Mr. Bell said that we couldn't include those tracts on the east side of the ward, because that area had changed and was now black and Puerto Rican, I think he said." Kazemek testified that there was some discussion about moving the 31st ward west; he thought it was Mr. Bell who made reference to it.
 
 
 63
 Conversations about the 14th and 16th wards.
 
 
 64
 Alderman Burke represented the 14th ward and Alderman Sheridan the 16th. Both aldermen are white. There was virtually undisputed testimony that Alderman Keane said something to Bell and the student interns to the effect that it was important to draw ward boundaries so that these two could be reelected. Although there was a conflict whether he mentioned race, the circumstances make it appear probable that race was the consideration Alderman Keane had in mind. As drawn by Bell, apparently after the conversation, the 16th ward, as well as the 14th, would probably have been majority white. It must be noted, however, that as ultimately drawn, the 16th ward is 95.3% black. The 14th is 6.2% black.
 
 
 65
 Mr. Taylor testified that Alderman Keane mentioned these wards and said, "The way you have it drawn isn't any good. We have to save those two young guys. They can't run in those wards. Those wards are all black and there is nowhere for them to live. These are young people. The City Council needs young people. A lot of us are getting old. These are bright people with college degrees, and they have a lot to contribute to the city." Taylor testified, "So he said that we should change that area if we could so that there would be some way for them to run in those wards."
 
 
 66
 Mr. Bell testified that Alderman Keane said, "You can't do that. You're taking two young and bright aldermen, and you are taking them out of the Council. They have bright political futures;" that Alderman Keane did not say anything about the black population in those two wards.
 
 
 67
 Mr. Kazemek testified, "We were working on an area of the city-I can't even recall which area but Alderman Keane pointed to that area and he made the statement that 'You can't do that to those two aldermen.' I recall the name Sheridan being mentioned. He said, 'You can't do that to them.' He said, 'They are bright and educated young people and we need that kind of person in the City Council.' " Mr. Kazemek did not recall that Alderman Keane said anything about the racial composition of the wards.
 
 
 68
 Mrs. Eme testified, ". . . I recall Mr. Sheridan's name being mentioned, Mr. Keane mentioned it, Mr. Keane coming in and saying that it would be difficult for him to be reelected in that ward that we drew, and then he proceeded to say, which makes me think that another man was mentioned, that they were two young men, with college educations, and the City Council was in need of fine men like that."
 
 
 69
 The district court announced orally several findings (not reflected in 322 F. Supp. 428) about this conversation. In certain respects these findings recited matters of record, already pointed out. In other respects, they are wholly inconsistent with the record and need not be treated here.
 
 
 70
 The 18th ward.
 
 
 71
 The present 18th ward (1970) is one mile wide, north to south, throughout almost all its length. It is approximately 5 miles long, east to west, except for irregular boundaries in its northeast and southwest corners. 28.2% of its residents are black. The areas in which black people are concentrated are in the eastern end. If the ward were drawn so as to extend farther north from its southern boundary and not so far east from its western boundary, it would be more compact, would have fewer black residents, and those left out would be joined with some other ward. The shape of the 18th ward as drawn suggests that it may have been an instrument in cutting into the area predominantly inhabited by black people so as to absorb them into a ward in which they would be a minority instead of including them in another ward in which they might be part of a majority of black residents.
 
 
 72
 At the trial a witness demonstrated the possibility of dividing the area now covered by wards 12, 13, 14, 15, 16, 17 and 18 into a different set of wards of equal population. In such redraft, at least wards 15 and 18 more closely approximate a square.
 
 
 73
 The statistical experts.
 
 
 74
 One of the witnesses called by plaintiffs was Dr. Philip M. Hauser, director of the Population Research Center of the University of Chicago. He has had many years of experience with the United States census, including being acting director for the 1950 census and chairman of the advisory committee for the 1960 and 1970 census. He also has represented the United States on the Population Commission of the United Nations.
 
 
 75
 Dr. Hauser testified, in answer to the question whether racial or ethnic considerations were taken into account in the drawing of the new ward map ". . . it is perfectly clear to me that the ward lines are drawn in such a way as to concentrate Negro population within wards and as to have majority white population where Negro populations are subsumed. . . ." He indicated several examples, including ward 18.
 
 
 76
 Dr. Hauser also testified, "It is my judgment, based on well established mathematical probability theory, that if race were not taken into consideration, or ethnicity in the case of Puerto Ricans, that all ward lines which cross well-known boundary lines or between blacks and whites and Puerto Ricans, and the remainder of the population, would have an equal probability of one or the other being a minority group." He said that the number of wards crossing the dividing lines in which black people or Puerto Ricans are the minority is "far above the level that probability expectations would indicate, or another way of saying that, it is perfectly clear to me that the ward lines on that map could not possibly have been drawn by anyone who was color blind."
 
 
 77
 Dr. Paul Meier, acting chairman of the department of statistics at the University of Chicago, accepting the assumption that if race or ethnic origin were not taken into consideration in drawing the lines it is equally probable that a ward crossing the racial boundary would have a black as a white majority, computed that if 14 wards crossed the boundary the probability that 12 would have white majorities and 2 white minorities is only 1 in 150.
 
 
 78
 With all respect, we point out that the theory of probability may have less significance for our present purposes to the extent that Alderman Keane's freedom of choice may have been limited by the varying shape and sizes of census tracts, and the desire, without invidious intent, to break as few tracts as possible into enumeration districts. We are, in short, at a point where a demonstration that the wards could, with the census figures at hand, have been drawn with similar equality of population, and no less compactness, but into more wards having a black or Puerto Rican majority would be more persuasive than an opinion that if wards had been drawn with indifference to race a greater number of black or Puerto Rican majority wards would have been more probable.
 
 
 79
 History and general background.
 
 
 80
 One of plaintiffs' witnesses was Mr. Donald Rose, director of research and communications for the National Catholic Conference for Inter-Racial Justice. He described studies he had made tending to show that as the black population of Chicago increased, the redistricting ordinances in 1931, 1947 and 1961 had changed ward boundaries in a manner corresponding to the growth of areas in which the residents were predominantly black, so as to keep at a high figure the number of wards in which the majority of residents were white.
 
 
 81
 Alderman Despres testified: "I think what you don't understand, Mr. Neal, is that every alderman in the city of Chicago is acutely interested and aware of the racial composition of the city. There is no subject that preoccupies the City Council and the aldermen of Chicago more insistently than that subject. Every alderman has a great deal of information about where the black persons in Chicago live and where the white persons live. . . . It is a subject which preoccupies aldermen almost pathologically."
 
 
 82
 Alderman Hoellen testified to a conversation in October 1970 with Alderman Wigoda, who Hoellen considered "has always been my rather vocal foe at City Hall." The latter indicated that the council "would be inundated with new Negro aldermen, come the remapping of 1970," and said to Hoellen, "Suddenly, we have much in common."
 
 
 83
 For an example of a public issue in Chicago which turns on racial residence patterns, see Gautreaux v. Chicago Housing Authority, 296 F. Supp. 907 (N.D.Ill. 1969), 304 F. Supp. 736 (N.D. Ill. 1969), 436 F.2d 306 (7th Cir. 1970).
 
 
 84
 The testimony just cited with respect to history and background at least suggests that claims that 1970 ward lines were chosen for the purpose of minimizing the voting strength of black people must not be found meritless without careful scrutiny.
 
 
 85
 VI. Conclusion with respect to claims of racial and ethnic gerrymandering.
 
 
 86
 Given the proposition that the city council is to be made up of aldermen, one elected by each ward, it follows that every resident has a right that the wards be equal (as nearly as feasible), so that the alderman who represents him represents the same number of residents (as nearly as feasible) as every other alderman, and that at least in mathematical terms each resident has representation in the same ratio as every other resident of the city. As decided in the Skolnick case, the 1970 ward map fulfilled this right in terms of the census figures known at the time of enactment.
 
 
 87
 Wards of unequal size, and resulting unequal representation, are one facet of invidious discrimination from which the 14th amendment protects such resident. But there may be other facets, as claimed here. Even though quantitative equality be preserved, members of a racial or ethnic group are protected, in our opinion, from having ward lines drawn for the purpose of diluting or minimizing the voting power of such group. We by no means assume that such group will always vote as a block, but to the extent its members choose to do so, they are to be protected from purposeful maneuvers to deprive them of effectiveness
 
 
 88
 Gomillion v. Lightfoot[6] held that "When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment." That case involved the creation of municipal boundaries and black people were the butt of the discrimination. Although Gomillion was grounded on the 15th amendment, which prohibits abridgement of the right to vote on account of race, it was decided two years before Baker v. Carr[7] opened up the courts to claims that malapportionment of legislatures denied equal protection under the 14th amendment. Recently, the Supreme Court has cited Gomillion as an example of "no hesitation in striking down those contrivances that can fairly be said to infringe on Fourteenth Amendment rights."[8]
 
 
 89
 Persons who may correctly be referred to as Puerto Rican (or Mexican or Latin American, or Spanish speaking Americans) are not a distinct race, as anthropologists define the term, although some of the common usages of the term would apply.[9] We do not deem it necessary to examine whether the 15th amendment, which forbids denial or abridgement of the right to vote on account of "race" is properly to be construed as protecting ethnic as well as racial groups from the sort of invidious dilution of voting power charged here. We are satisfied that the equal protection clause of the 14th amendment provides such protection in any event.
 
 
 90
 We note that although the challenges raised in behalf of black and Puerto Rican citizens in Wright v. Rockefeller[10] were unsuccessful because of failure of proof, there is nothing in the opinions to suggest that the presence of Puerto Ricans among those allegedly discriminated against detracted from plaintiffs' case. On page 58, 84 S.Ct. on page 606, for example, the Court said, "We accept the District Court's finding that appellants have not shown that the challenged part of the New York Act was the product of a state contrivance to segregate on the basis of race or place of origin. That finding was crucial to appellants' case as they presented it, and for that reason their challenge cannot be sustained."
 
 
 91
 Whitcomb v. Chavis[11] involved a claim that the vote of black persons and poor persons was invidiously diluted. Again the challenge failed for want of proof, but the language chosen by the Court implies, it seems to us, that this type of challenge need not be based on race in order to be successful: "But there is no suggestion here that Marion County's multi-member district, or similar districts throughout the State, were conceived or operated as purposeful devices to further racial or economic discrimination."[12]
 
 
 92
 We take judicial notice that according to revised census figures Chicago has a population of 3,366,957, of whom 1,102,620, or 32.7%, are black. The 15 wards in which (according to census figures) a majority of the residents are black elect 30% of the city's aldermen. 16 wards would elect 32%, 17 wards 34%. Any comparison of the percentage of residents who are black with the percentage of the council to be elected by wards containing a black majority has significance only because of residential patterns in which black residents are concentrated in large, well defined areas. A minority group completely and equally dispersed throughout the city could not be in the majority in any ward. Given a minority as substantial as 32-33%,[13] residential segregation, and division into 50 equal wards, the number of majority black wards is necessarily substantial, although the exact number may vary for a number of reasons even if purposeful discrimination is not a factor. There is no principle which requires a minority racial or ethnic group to have any particular voting strength reflected in the council. The principle is that such strength must not be purposefully minimized on account of their race or ethnic origin.
 
 
 93
 Plaintiffs clearly established, in our opinion, that the location of predominantly black and Puerto Rican areas was considered as Alderman Keane prepared to formulate the new ward boundaries. There is evidence from which it could be inferred that the contours of the 31st ward were chosen for the purpose of avoiding the presence of Puerto Rican residents, that those of the 18th ward were chosen for the purpose of putting black people in a minority in that ward in place of joining those people with other black people in a possible majority status in another ward and, perhaps less readily, that the location and contours of the 14th were chosen so that black people would be an insubstantial minority therein. There is also opinion evidence that the ward lines were discriminatory, and evidence that for many years successive ward maps had been devised so as to maximize the number of white majority wards.
 
 
 94
 It does appear that the 1970 map produced 15 majority black wards (14 of which elected black aldermen in 1971) whereas the previous council contained only ten black aldermen. It must be said that the transcript of proceedings before the subcommittee during which Alderman Keane assembled census tracts into wards does not on its face suggest anything other than an attempt to create wards with equal population and at least some degree of compactness. One of plaintiffs' experts, Mr. De Vise, although of the opinion "that race was a factor in the delineation of wards," went on to say that "I do not think that race was a major consideration. I think that the major consideration was probably the retention of the old wards."
 
 
 95
 Plaintiffs did not produce other persuasive circumstantial proof that the ward boundaries were the product of purposeful discrimination, such as demonstration that one or more maps could be drawn, using the data available to the city in October, 1970, achieving population equality, and at least a similar degree of compactness, which would produce more than 15 wards with a clear majority of residents of one or the other or both the black and Puerto Rican groups. Defendants, on the other hand offered no proof that this could not be done.
 
 
 96
 Although we are convinced that the district court took a clearly erroneous view of the Bell-student map project and thus failed to consider important elements of plaintiffs' case, we are unable to say that plaintiffs' evidence so clearly established that the ward boundaries were the product of purposeful discrimination as to permit this court so to find. If the litigation concerned ordinary interests of the plaintiffs alone, we might well conclude that they must bear the burden of failure to establish more clearly all elements of their case. We are of the opinion, however, that the type of rights involved here requires special care that claims of impairment be thoroughly inquired into.
 
 
 97
 It might, indeed, be argued that plaintiffs have shown enough so that the matter could be resolved by returning the matter to the district court for the limited purpose of a demonstration whether or not, following an objective standard, rationally related to redistricting and indifferent to race and ethnicity (such as, perhaps, reaching "the nearest practical approximation to perfect compactness")[14] and achieving population equality, a remapping would produce more than 15 wards with a clear majority of residents of one or the other or both the black and Puerto Rican groups.
 
 
 98
 We conclude, however, that the proper and just result, is a new trial of the issues. Should plaintiffs succeed, and a new partial or complete ward map be decreed, jurisdiction has been preserved so that the district court could order an election for aldermen from the wards affected, to serve for the balance of the current four year term, and declare such seats on the existing council vacant promptly after said election.
 
 
 99
 If plaintiffs are unable to succeed on retrial, defendants will be entitled to judgment in this action. We do feel called upon to observe, however, that considerable revisions in census figures have been announced since enactment of the 1970 ordinance and since the election for the current term in February 1971, and it has been suggested that the revised figures produce a substantial disparity in population among the wards. We note that the decree in Skolnick requires that the 1970 ordinance shall govern all elections until after the 1980 census.[15] Under the terms of our affirmance of Skolnick, earlier referred to, such provision must necessarily yield to a decree in this action if plaintiffs are successful upon remand. We also observe that if the changes in census data show sufficient disparities among wards that the 1970 map could no longer be sustained under one person-one vote constitutional principles, the decree must yield to those principles and the council would have the duty of drawing a new ward map for the purpose of the election in 1975.
 
 
 100
 VII. Consideration of political factors in drawing ward lines.
 
 
 101
 Plaintiffs produced evidence that one motivation in drawing the ward lines was to keep each incumbent alderman and the incumbent ward committeemen within a ward which approximated his ward according to the 1961 map and to avoid pitting one incumbent against another in any new ward.
 
 
 102
 They also produced evidence tending to show that in Chicago there are certain areas where so-called independent voters are concentrated, and that the 1970 remap involved intentional concentration of such voters in two wards for the purpose of minimizing the number of aldermen such votes might elect.
 
 
 103
 The groups which are the butt of the discrimination claimed by plaintiffs are somewhat amorphous: in the first instance they are the persons who might want to support a non-incumbent candidate and persons who might be such candidates; in the second instance, persons who habitually are less likely than others to favor party endorsed candidates and more likely to favor candidates who are not endorsed. We are of the opinion that disfavoring of such groups by those who are drawing the districts, even if identification and community of political faith were proved with much greater definiteness than here, remains among the non-justiciable political questions.
 
 
 104
 The only expression by the Supreme Court cited by plaintiffs in support of this branch of their case is a reference in Fortson v. Dorsey[16] to minimizing or cancelling out the voting strength of "racial or political elements of the voting population" in dealing with possible invidious discrimination in creating multimember districts. Any force in the reference, however, is offset by the Court's affirmance of a decision that political gerrymandering does "not raise questions under the Federal Constitution."[17] Mr. Justice Harlan, concurring, concluded that the court was affirming the district court's ruling rejecting any federal constitutional attack on partisan gerrymandering.[18]
 
 
 105
 Additionally, lower courts which have considered allegations of political gerrymandering have uniformly rejected the justiciability of such claims. See Sims v. Baggett, 247 F. Supp. 96, 104 (M.D. Ala. 1965); Sincock v. Gately, 262 F. Supp. 739, 833 (D.Del.1967); Meeks v. Avery, 251 F. Supp. 245, 250 (D. Kan. 1966); Bush v. Martin, 251 F. Supp. 484, 510, 513 (S.D.Tex.1966); Kilgarlin v. Martin, 252 F. Supp. 404, 432 (S.D. Tex.1966); rev'd on other grounds, Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). In particular we note the excellent discussion by Judge Cannella, concurring in Wells v. Rockefeller, 311 F. Supp. 48, 54 (S.D.N. Y.1970), aff'd 398 U.S. 901, 90 S.Ct. 1696, 26 L.Ed.2d 60 (1970).
 
 
 106
 Plaintiffs have not persuaded us that these lower court cases were wrongly decided, nor demonstrated that their present claim meets the criteria of justiciable question as set forth in Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).
 
 
 107
 VIII. Standing to sue.
 
 
 108
 The district court found that no plaintiff claimed an injury or impairment of an individual right, and hence had no standing to sue. The basis noted by the court was that the plaintiffs who testified were not dissatisfied with their own wards. We think, however, that the interest involved in the racial or ethnic gerrymandering claim is not limited to one's interest as a voter in a ward, but includes the interest of a black or Puerto Rican plaintiff as a resident of the city that the voting strength of his group is not diminished by invidious discrimination. Such interest is impaired, if plaintiffs' assertions have merit, even though the particular plaintiff is in a ward where his group is in the majority.
 
 
 109
 Although reapportionment litigation necessarily affects the interests of a large class, and actions to compel reapportionment are customarily brought as class actions, we think the class action device is not essential. The court's proper concern is whether there are before it parties alleging "such a 'personal stake in the outcome of the controversy,' Baker v. Carr, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663], as to insure that 'the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.' Flast v. Cohen, 392 U.S. 83, 101 [88 S.Ct. 1942, 1953, 20 L. Ed.2d 947]."[19]
 
 
 110
 We conclude that plaintiffs here who allege they are black or Puerto Rican and therefore among the group whose voting strength is allegedly purposefully diluted have such standing.
 
 
 111
 The district court found that the action could not be brought as a class action because plaintiffs had failed to establish the existence as classes of all black voters of the city and all voters of Puerto Rican or other Latin American ancestry. The finding was apparently based on the fact that there are black residents of Chicago, perhaps many in number, who favor the remap ordinance, and plaintiffs clearly do not represent them. It would be fanciful to suppose there were not a large number of black persons and Puerto Ricans who agreed with plaintiffs. There is authority that in similar situations, the fact that some members of an alleged class are opposed to the claim is irrelevant.[20] But in any event, we think plaintiffs have sufficient standing as individual members of the groups allegedly discriminated against.
 
 
 112
 IX. Use of depositions.
 
 
 113
 Prior to trial, plaintiffs, with leave of court, took the depositions of Alderman Keane and several others. Because of the exigencies of time the district judge had the depositions taken before himself. There were colloquies supporting the thought that the depositions were taken for purposes of discovery. After plaintiffs rested at trial, defendants offered the depositions of Alderman Keane and several others. Plaintiffs objected, but the court received them.
 
 
 114
 Under the circumstances, defendants could use these depositions, under Rule 32(a)(3), F.R.Civ.P. only if the court found, under (E) "that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used." In the light of our disposition of the case, we need not decide whether the depositions were properly admitted under (E). If the exigencies of time, and the other attendant circumstances fulfilled (E), these considerations will not prevail at retrial.
 
 
 115
 The judgment is reversed and the cause remanded for further proceedings consistent with this opinion. Under Rule 23 of the local appellate rules of this court, adopted April 4, 1972, retrial will be had before a judge other than the judge who originally heard it, unless all parties request that the same judge retry the case.
 
 
 116
 STEVENS, Circuit Judge (dissenting).
 
 
 117
 A "gerrymander" has been defined as "an unfair arrangement of electoral districts designed by the dominant party to give it an advantage over its rival in future elections."[1] It is a means by which the "ins" seek to maximize their advantage over the "outs." As long as legislative bodies are permitted to define the districts from which their membership will be elected, the purpose of the gerrymander will, to some extent, influence the line-drawing process. Inevitably we must tolerate some manifestation of that purpose or else commit the responsibility for districting to a nonlegislative body.
 
 
 118
 Faced with a choice between undesirable alternatives, some have concluded that "gerrymandering" issues arise in a thicket which courts may not enter; the questions are "political" rather than "justiciable." Others have concluded that its thorny outcroppings may become so gnarled and hideous that decades of accepted doctrine should be leveled by one sweep of a giant scythe;[2] "invidious discrimination" is constitutionally intolerable. Every gerrymander, indeed possibly every redistricting, is at once "political," and therefore immune, and "discriminatory," and therefore vulnerable.
 
 
 119
 Twice the Supreme Court has squarely confronted the dilemma. In Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, it was presented with a redistricting of Tuskegee, Alabama, which altered its shape "from a square to an uncouth twenty-eight-sided figure." 364 U.S. at 340, 81 S.Ct. at 126. That legislation was "solely concerned" with the segregation of voters on the basis of race. Id. at 341, 81 S.Ct. 125. Viewing the allegations, if proven, as establishing that the act in question was so extraordinary as to be not "even within familiar abuses of gerrymandering," ibid., the Court promptly and unanimously held such districting unconstitutional.[3]
 
 
 120
 The following Term the Court was presented with the consequences of 60 years of inaction by the Tennessee legislature.[4] Because of population changes since 1900 and the failure of the state legislature to reapportion itself, the old boundaries had allegedly become "wholly arbitrary, . . . and, indeed, based upon no lawfully pertinent factor whatever."[5] With less unanimity, with less promptness, and without analysis of the term "gerrymander," the Court again decisively invalidated the means by which the "ins" maximized their ability to exclude the "outs."
 
 
 121
 As a result of those two decisions, it has become clear that some gerrymandering is justiciable, but it remains equally clear that some is still considered political and nonjusticiable. The dilemma survives and is illustrated by the case before us. Plaintiffs represent three groups of "outs"-blacks, Puerto Ricans, and independents-who claim that the "ins" have drawn ward boundaries to maximize their chances of reelection, or stated conversely, to dilute the voting strength of cognizable groups of "outs." In essence, the district court found that no such purpose existed.[6] Judge Fairchild has demonstrated why such findings are clearly erroneous. I think he is also correct in concluding that the Supreme Court will afford the same protection against "invidious dilution of voting power" to ethnic as to racial groups. But I reach this conclusion by a route which encompasses "independents" and other significant elements of the body politic as well, and which, notwithstanding the significant imperfections in the City's case, persuades me that the judgment should be affirmed.
 
 
 122
 I am persuaded (1) that so-called "racial gerrymandering" and "political gerrymandering" must be judged by the same constitutional standard; (2) that the standard is more severe than the test which the majority directs the district court to apply; and (3) that it dictates affirmance on the record before us.
 
 I.
 
 123
 An easy distinction between racial and political gerrymandering was afforded by the fact that the decision in Gomillion was rested on Fifteenth Amendment grounds whereas unsuccessful attacks on political gerrymandering have been predicated on the Fourteenth Amendment. The distinction is illusory.
 
 
 124
 In his concurring opinion in Gomillion, Mr. Justice Whittaker succinctly demonstrated that the same result was required by the Equal Protection Clause of the Fourteenth Amendment.[7] Mr. Justice Douglas noted that he adhered to views previously expressed in dissents which presaged Baker v. Carr's subsequent holding predicated on the Equal Protection Clause.[8] Even the author of the Court's opinion in Gomillion later described the holding in that case in terms more appropriate to the Fourteenth than to the Fifteenth Amendment.[9] And to complete the circle, the Court last term actually cited Gomillion as though it had been decided on Fourteenth Amendment grounds.[10]
 
 
 125
 Shortly after the adoption of the Equal Protection Clause, Mr. Justice Miller doubted whether any discrimination except that directed against "negroes as a class, or on account of their race, will ever be held to come within the purview of this provision." Slaughter-House Cases, 16 Wall. 36, 81, 21 L. Ed. 394. But as Mr. Justice Rehnquist has pointed out, 100 years of subsequent adjudication have proved Mr. Justice Miller "a bad prophet with respect to nonracial classification."[11] Indeed, at the turn of the century, the Court had already extended the list of impermissible classifications to include those depending on "differences of color, race, nativity, religious opinions [or] political affiliations." American Sugar Refining Co. v. Louisiana, 179 U.S. 89, 92, 21 S. Ct. 43, 44, 45 L.Ed. 102 (emphasis added). More recently, in cases involving voting rights, the Court has made it abundantly clear that invidious discrimination against various kinds of groups, in addition to racial groups, is condemned by the Equal Protection Clause.
 
 
 126
 Thus, in Whitcomb v. Chavis the Court plainly stated that it would not countenance districts "conceived or operated as purposeful devices to further racial or economic discrimination." 403 U.S. 124, 149, 91 S.Ct. 1858, 1872.[12] The question reserved in Fortson v. Dorsey related to an apportionment scheme that might "operate to minimize or cancel out the voting strength of racial or political elements of the voting population," 379 U.S. 433, 439, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401, quoted in Whitcomb at 143, restated at 144, 91 S.Ct. 1858, 29 L.Ed.2d 363, and also quoted in Burns v. Richardson, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376. In Abate v. Mundt, the Court noted the absence of any "built-in bias tending to favor particular political interests or geographic areas." 403 U.S. 182, 187, 91 S.Ct. 1904, 1908, 29 L.Ed.2d 399. Mr. Justice Douglas has stated that the Equal Protection Clause protects "voting rights and political groups . . . as well as economic units, racial communities, and other entities." Williams v. Rhodes, 393 U.S. 23, 39, 89 S.Ct. 5, 15, 21 L.Ed.2d 24 (separate opinion). The proposition that "legislators represent people, not trees or acres," Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 1382, 12 L. Ed.2d 506, is an eloquent restatement of the requirement of "equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State." Id. at 560-561, 84 S.Ct. at 1381. Although quoted out of their context, the words to which I have added emphasis plainly indicate the variety of groups of voters which are equally entitled to protection against invidious discrimination.[13]
 
 
 127
 As a matter of principle, invidious discrimination against Americans of Polish, German, or Italian ancestry is just as indefensible as discrimination against Americans of African ancestry. It seems equally clear that such discrimination against Catholics, Jews, Protestants or Mormons is in the same category. Unquestionably the same rules must be applied to the classification of voters on grounds of national origin, ethnicity, or religion, as race. It can be demonstrated that political groups are also entitled to equal treatment.
 
 
 128
 The point can be made in two ways, first in terms of impact on the individual's right to vote, and second in terms of impact on the group's political strength.[14]
 
 
 129
 Almost all of the Supreme Court decisions in the field of voting rights are concerned with discrimination which directly affects the individual right. Abridgment of an individual's right to participate in the electoral process, either by denying him the opportunity to vote,[15] or by counting his vote as worth only a fraction of the vote of another citizen,[16] obviously could not be justified on the basis of political affiliation any more than on the basis of his race. To the extent that an attack on gerrymandering is supported by these cases, its force would apply equally to ethnic, political or racial classifications.
 
 
 130
 The gerrymander, however, does not directly[17] or necessarily affect the individual right to vote. It is aimed at groups of citizens and is intended to diminish the likelihood that their candidates will be elected. When used as a maneuver against rival political organizations, it is defended as part of our hallowed American tradition, but when directed against minority races, it is attacked as invidiously discriminatory.[18] The validity of the supposed distinction between accepted tradition and invidious discrimination may be tested by considering its application to a specific case.
 
 
 131
 Discrimination on the basis of national origin is in the same category as racial or ethnic discrimination. Thus, a gerrymander directed at voters of Irish ancestry is invidious, particularly if it also reflects a prejudice against members of one religious faith. But if the parallel interests of the members of such a group should lead them into the same political party, would a gerrymander directed against them cease to be invidious and suddenly become routine politics? On the other hand, if the members of such a group should divide their political affiliation in roughly equal parts between two political parties, is it conceivable that a gerrymander would be tailored on ethnic lines? Whether these questions are answered from the standpoint of the group seeking protection or in terms of the motivation for the gerrymander, it is important to focus on the assumption that all, or many, members of an ethnic group will vote alike. From either point of view the significance of the gerrymander is directly related to the validity of that assumption.
 
 
 132
 Obviously the success of a gerrymander is dependent on the ability of the "ins" to predict how groups of citizens will vote and to tailor district boundaries to fit their predictions. Harry Truman taught us that such predictions are unreliable and Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, has drastically limited the alternative designs which may be used. Nevertheless, inevitably the practical politician will try to predict the blue collar vote, the black vote, the Jewish vote, the suburban vote, the Polish vote, and many others. Such predictions are realistic reflections of the fact that various components of the body politic share common interests that tend to lead to parallel voting. But it is the parallel character of the voting of members of the group-rather than the source of their common interests-that motivates the gerrymander. Thus the motivation for the gerrymander is a function of the political strength of the group at which it is directed. That motivation is unaffected by the kind of characteristic-whether religious, economic, or ethnic-that gives the group political cohesion.
 
 
 133
 If we turn our attention to the minority group's interest in protection against unfair tactics by the majority, it is again important to remember that we are concerned with the political strength of the group which is, in part, a function of the extent to which the members tend to vote for the same candidates. The mere fact that a number of citizens share a common ethnic, racial, or religious background does not create the need for protection against gerrymandering. It is only when their common interests are strong enough to be manifested in political action that the need arises. Thus the characteristic of the group which creates the need for protection is its political character. It would be anomalous indeed if the characteristic which made constitutional protection necessary should at the same time make it unavailable. Yet that is the logical consequence of an inflexible rule that "political" gerrymandering is not justiciable.
 
 
 134
 Unquestionably, particular minority groups can make especially persuasive arguments for protection against political discrimination. The black and the Puerto Rican plaintiffs in this case are appropriate examples. Perhaps their common interests and needs are of such overriding importance today that it would be wise policy to devise special rules to enable their group voting strength to manifest itself. Such a result might accelerate needed social change. But the constitutional protection must be available tomorrow as well as today; it must protect all minority groups equally and without regard to their varying interests in issues of current importance.
 
 
 135
 In my opinion an interpretation of the Constitution which afforded one kind of political protection to blacks and another kind to members of other identifiable groups would itself be invidious. Respect for the citizenry in the black community compels acceptance of the fact that in the long run there is no more certainty that these individuals will vote alike than will individual members of any other ethnic, economic, or social group. The probability of parallel voting fluctuates as the blend of political issues affecting the outcome of an election changes from time to time to emphasize one issue, or a few, rather than others, as dominant. The facts that a political group has its own history, has suffered its own special injustices, and has its own congeries of special political interests, do not make one such group different from any other in the eyes of the law. The members of each go to the polls with equal dignity and with an equal right to be protected from invidious discrimination.
 
 
 136
 In sum, I am persuaded that an evenhanded application of the Equal Protection Clause requires that political groups such as Federalists,[19] members of the "Ohio-American Independent Party,"[20] "crossovers"[21] unregistered voters, or opponents of an entrenched urban political organization,[22] have the same right to invoke its protection as members of an ethnic, economic or racial group. The constitutionality of a gerrymander depends not on the identity of the rival group which the arrangement is designed to disadvantage, but rather on whether its unfairness is appropriately characterized as "invidious." I believe all gerrymandering should be judged by the same constitutional standard.
 
 II.
 
 137
 When is the majority's deliberate dilution of the voting strength of a minority group impermissible? The question may be answered in many different ways.
 
 
 138
 First: We might be unable to state a "judicially manageable standard" and conclude that all gerrymandering issues are therefore political and nonjusticiable. I believe Gomillion forecloses this answer, particularly since that case is now cited as though it had been decided on Fourteenth Amendment grounds.[23]
 
 
 139
 Second: We might conclude that compliance with the "as nearly as is practicable" standard of mathematical equality of Wesberry v. Sanders, 376 U.S. 1, 7-8, 84 S.Ct. 526, 11 L.Ed. 481, which in itself has eliminated many flagrant examples of the gerrymander, is a sufficient answer. Under this view, Gomillion may be put to one side because it was decided before the numerical standard was developed.[24] This answer has respectable support and certainly is not squarely foreclosed by any Supreme Court holding.[25] Nevertheless, I am persuaded that if a parallel to Gomillion should arise today, and if areas A and B identified in Mr. Justice Whittaker's opinion were equally populated, his rationale would provide the basis for a like decision. Otherwise, I cannot explain the Court's citation of Gomillion in its recent opinion in Whitcomb. See 403 U.S. 124, at 149, 91 S.Ct. 1858, 29 L.Ed. 2d 363. Furthermore, the Court considered the gerrymandering claim in Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512, even though no allegations of numerical disparities were made. Id. at 58, 84 S.Ct. 603.
 
 
 140
 Third: We might parrot the "sole purpose" language from the Gomillion opinion[26] and find the discrimination "invidious" if it meets that strict standard. A test so phrased would harmonize with Gomillion and later cases,[27] but would really be no different from simply relying on mathematical equality. For it may be argued in every case since Wesberry that achieving numerical equality was the primary, or at least certainly a major, purpose of the redistricting; hence, a gerrymandering purpose could never be the "sole" purpose. I reject this test for the reasons stated above. I have no doubt that resourceful and imaginative legislators, possibly aided by computer technology or academic interns, might be able to devise numerically equal districts that would nevertheless transgress a judicially manageable standard.
 
 
 141
 Fourth: At the opposite end of the spectrum we might condemn any districting which was tainted by any discriminatory purpose.[28] The test as stated in Whitcomb, and restated here by Judge Fairchild, might be so interpreted. That interpretation is entirely proper as a measure of the adequacy of a claimed justification for a deviation from the requirement of mathematical equality. Because such a deviation directly impinges on the individual's voting right, it bears a heavy burden of justification on recognizably permissible grounds.[29] But I believe a different standard must be applied in a case in which every individual's vote is accorded equal weight and is, therefore, not "diluted" in the sense in which that word has been used in cases descending from Baker v. Carr.
 
 
 142
 The claim here is that the discrimination is directed primarily at a cognizable group and, therefore, only indirectly at its members. To the extent that an individual in fact shares the political views of the group as a whole, his chances of voting for the winning candidate may be impaired. But his voice in the selection of that candidate is just as strong as that of every other voter in the election.
 
 
 143
 Since district or ward boundaries are drawn by the legislative process, they will inevitably reflect compromises and awareness of group interests.[30] If the constitutional standard is so strict that any purpose to disadvantage a block of voters is enough to warrant the "invidious discrimination" label, the facts of political life will deny legislatures the right to perform the districting function. It is not for me to comment on whether such a drastic change might be desirable; I merely conclude that a test which would require legislators to act with complete indifference to the impact of districting on cognizable groups of voters is simply much too strict. It would either open the door to invalidation of all apportionment plans or require legislatures to perform ridiculous charades in their public deliberations and to do their only significant work in private conference.[31]
 
 
 144
 Thus, I conclude that the mere existence of some purpose to discriminate against a disadvantaged group is insufficient to invalidate the ordinance.
 
 
 145
 Fifth: We might analyze the subjective motivation of individual members of the legislative body and void their work product on the basis of evidence of individual discriminatory purpose. Under this approach, sound legislation would be invalidated by the improper motives of its sponsors.[32] For reasons first articulated by Chief Justice Marshall, this approach has been rejected by the Supreme Court consistently since 1810. Fletcher v. Peck, 6 Cranch 87, 13 0; United States v. O'Brien, 391 U.S. 367, 382-384, 88 S.Ct. 1673, 20 L.Ed.2d 672; Palmer v. Thompson, 403 U.S. 217, 224-225, 91 S.Ct. 1940, 29 L.Ed.2d 438.
 
 
 146
 In my opinion, customary indicia of legislative intent provide an adequate basis for ascertaining the purpose that a law is intended to achieve. The formal proceedings of the legislature and its committees, the effect of the measure as evidenced by its text, the historical setting in which it was enacted, and the public acts and deeds of its sponsors and opponents, provide appropriate evidence of legislative purpose. Such facts were sufficient to form a basis for the strong dissent by Mr. Justice White in Palmer v. Thompson, 403 U.S. at 240-271, 91 S. Ct. 1940; certainly the majority of the Court would consider nothing less formal or public. See 403 U.S. at 224-225, 91 S.Ct. 1940.
 
 
 147
 Regardless of one's appraisal of the procedures employed by the City Council of the City of Chicago, it demeans the legislative process[33] to inquire into private conversations between aldermen[34] or to draw an invidious inference from the fact that members of the Council are "acutely aware" of the racial composition of changing areas of the City. Of course they are. Responsible legislators are expected by their constituents, black and white, rich and poor, to be informed about such matters. I therefore would wholly reject the kind of subjective motivation analysis which the parties and the district court apparently considered relevant in this case.
 
 
 148
 Sixth: We might make an objective analysis of the effect of the districting on identifiable groups of disadvantaged voters and invalidate boundaries which deny any such group its proportionate share of districts in which its members constitute a majority. Under this approach, fragmentation of a group plainly large enough to be entitled to elect its own representative, or the consolidation of disproportionately large numbers of one group in a few districts to minimize the number in which they constitute the majority, would be equally vulnerable. Under such an objective standard, the Puerto Rican plaintiffs present a compelling case. The evidence indicates that this group lives in a contiguous area which includes a population (80,000) substantially larger than a single ward (66,582), and yet it does not constitute a majority in any ward because of its fragmentation into three parts by the ward boundaries. But the multi-member districting of Marion County, Indiana, had an equally dramatic impact on an equally cognizable group of disadvantaged voters and was sustained in Whitcomb v. Chavis.[35]
 
 
 149
 A constitutional requirement of proportional representation for all minority groups would not only be unworkable, but also undemocratic. The difficulty inherent in any attempt to define a group's entitlement to proportional representation would frustrate the formulation of the plan.[36] But even if the groups could be categorized, the reasons why such voter classifications should be abjured in a democracy have been eloquently identified by Mr. Justice Douglas's description of certain electoral register systems. See 376 U.S. at 63-67, 84 S.Ct. 603. At the very least, it is doubtful that the Fourteenth Amendment would permit proportional representation of ethnic groups; it is certain, however, that it does not require such a result.[37]
 
 
 150
 The holdings in Whitcomb v. Chavis, supra, and Ferrell v. Hall, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328, necessarily reject a standard which would invalidate every gerrymander which has a significant impact on the number of districts in which any cognizable group constitutes the majority.
 
 
 151
 Seventh: In both Whitcomb v. Chavis and Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512, the Court implied that the validity of a gerrymander may be measured by the legislature's "purpose." In Wright the Court stated that the proof failed to establish a "state contrivance" to segregate on the basis of race,[38] and in Whitcomb the Court stressed the absence of any suggestion that the districts were conceived as "purposeful devices" to further racial or economic discrimination.[39] Words like "contrivance," "device," and "purposeful" obviously may have different significance for different members of the Court,[40] but do suggest that the use of such concepts in other cases involving the Equal Protection Clause be considered.
 
 
 152
 Customarily, claims predicated on the Equal Protection Clause involve some analysis of the "purpose" of the legislative classification under attack. Different adjectives have been used to describe the objectives, or state interests, that will justify legislative classifications. One broad category includes terms like "compelling," "substantial" "subordinating," "paramount," "cogent," and "strong," see United States v. O'Brien, 391 U.S. at 376-377, 91 S.Ct. 1940, and cases there cited; whereas another category merely describes what is to be avoided with words like "irrational," "arbitrary," "impermissible," or the phrase "wholly irrelevant to the achievement of a valid state objective." In the former category, a heavy burden of justification rests on the state, whereas in the latter, a heavy burden rests on the litigant who seeks a declaration that a statute is unconstitutional.
 
 
 153
 As between the two alternatives, quite obviously the "compelling state interest" standard could seldom be satisfied in an apportionment case. Rarely would a state have a sufficiently strong interest in a particular set of boundaries, as opposed to alternatives which could be suggested, to satisfy that test. The holding and reasoning of the Whitcomb case itself, with its heavy emphasis on the need for setting a standard which can "contain" districting litigation within judicially appropriate bounds, see, e.g., 403 U.S. at 156, 91 S.Ct. 1858, forecloses the acceptance of such a strict test. Whitcomb plainly demonstrates that the burden which plaintiffs must overcome is a severe one, comparable, though the words are not used in the opinion, to a showing that the legislative classification "rests on grounds wholly irrelevant to the achievement of a valid state objective." Turner v. Fouche, 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567. I am persuaded that such a test provides a workable guideline for judicial management of gerrymandering litigation.[41]
 
 
 154
 Under that standard the "purposes" of the legislation can be identified by customary indicia of legislative intent. If the basic plan is designed to follow historic political boundaries, natural barriers, or reflects a consistent endeavor to achieve compactness to the extent allowed by the requirements of contiguity,[42] and, of course, if the equal population requirement is met, rarely if ever could a plan be attacked as wholly irrational.
 
 
 155
 But if inexplicable, grotesque shapes, reminiscent of Gomillion, or the Massachusetts shoestring, or the Illinois saddlebag, should emerge, and if the pattern should be explicable only by reference to a purpose to segregate or to disadvantage a definable group, the absence of a permissible basis for the classification could be established by proof.[43]
 
 
 156
 This is not to suggest that every gerrymander may be identified by mere inspection of configurations. Unquestionably at times unique shapes will be produced by the need to satisfy the requirement of equal numbers or some other legitimate factor. But if a highly improbable shape is inexplicable except by reference to an impermissible gerrymandering purpose, in my opinion a challenge to the classification as resting on a ground wholly irrelevant to the achievement of a valid state objective should be sustained. In sum, notwithstanding equality of numbers, and notwithstanding the particular reason why the classification of voters was impermissible, I would expect another case like Gomillion again to produce prompt and unanimous disapproval from the Supreme Court.
 
 III.
 
 157
 In deciding whether plaintiffs are entitled to another trial, their evidence should be construed liberally in their favor. So interpreted, it establishes three factual propositions: (1) the statistical evidence demonstrates that the ward boundaries were not drawn by a process of random selection; (2) the deviations from random criteria had an adverse impact on the political strength of each of the three groups of plaintiffs; and (3) the City Council was aware of the consequences of its actions.
 
 
 158
 Plaintiffs' evidence is therefore sufficient to support the inference that political, ethnic, and racial factors were among the criteria considered by the Council in drawing the ward boundaries. Under the strict standard espoused by Justices Douglas and Goldberg in dissent in Wright v. Rockefeller (see note 28, supra), a remand for a new trial as to all three groups would be appropriate. Indeed, under that standard, almost every deviation from the results which would be expected from the exclusive use of random or neutral factors would presumably provide some disadvantaged political group with the right to judicial review of election district boundaries. For proof of adverse impact would raise the inference that the legislature was conscious of the discriminatory results of its work, and thus some evidence of an improper purpose would exist.
 
 
 159
 My understanding of the word "contrivance" in Wright v. Rockefeller, the words "purposeful device" in Whitcomb v. Chavis, and the word "uncouth" in Gomillion, limits the availability of judicial review to much more egregious cases. I do not suggest that facts as extraordinary as those alleged in Gomillion are necessarily required,[44] but I am persuaded that if compliance with the standard of population equality is present, judicial intervention is not warranted unless the facts dramatically and convincingly foreclose any permissible construction of the legislature's work. This plainly is not such a case.
 
 
 160
 Indeed, plaintiffs' own evidence identifies an acceptable explanation for the deviations from results which would be expected to follow from the use of purely random criteria. The principal purpose of the City's plan was, of course, to meet the requirement of substantial equality of population. Within that stricture plaintiffs' evidence demonstrated that the Council's major guideline was the retention of the old ward boundaries to the extent that it could do so.[45] The adverse impact on the plaintiffs was in the nature of a by-product of that basic plan.
 
 
 161
 The question then is whether the attempt to adhere to pre-existing ward boundaries satisfies the requirement of relevance to the achievement of a valid State objective. Unquestionably a plan based on historic boundaries will not reflect a random distribution of ethnic or racial groups because such groups have tended to concentrate in adjacent geographical areas throughout Chicago's history. Nevertheless, I think it is clear that the preservation of historic political boundaries is an acceptable State or municipal objective in redistricting.[46] Since the disadvantages of which plaintiffs complain are explicable by reference to that objective, the discrimination is not "invidious." Cf. McGowan v. Maryland, 366 U.S. 420, 425-426, 81 S. Ct. 1101, 6 L.Ed.2d 393.
 
 
 162
 It must be remembered that the adverse impact on the plaintiffs is based on a comparison with a theoretical ideal, rather than with preexisting ward boundaries. Significant abuses in the form of population disparity have largely been eliminated as a consequence of Baker v. Carr and subsequent cases. The Supreme Court has plainly indicated that once the requirement of population equality is satisfied, the judiciary is to play only a limited role in the essentially political task of drawing boundaries for election districts. The Gomillion decision remains viable as a protection against flagrant gerrymandering, but does not, in my opinion, control the disposition of this case. Cf. Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512. Plaintiffs' case is significantly weaker than Wright v. Rockefeller. The record in that case contained persuasive evidence of reliance on impermissible factors and no evidence of justification on the basis of an acceptable criterion. The Supreme Court's affirmance of the order dismissing that complaint persuades me that a like result is required here.
 
 
 163
 I respectfully dissent.
 
 
 
 [1]
 Skolnick v. Mayor and City Council of Chicago, 415 F.2d 1291 (7th Cir. 1969), cert. den. 397 U.S. 954, 90 S.Ct. 984, 25 L.Ed.2d 138
 
 
 [2]
 Skolnick v. Mayor and City Council, 319 F.Supp. 1219 (N.D.Ill.1970)
 
 
 [3]
 24 S.H.A. Sec. 21-36
 
 
 [4]
 People ex rel. Woodyatt v. Thompson, 155 Ill. 451, 40 N.E. 307, 315 (1895)
 
 
 [5]
 Cf. Independent review of record in first amendment cases involving review by the Supreme Court of state court adjudications, Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), N. Y. Times v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), Bachellar v. Maryland, 397 U.S. 564, 566, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970), Greenbelt Publishers Association v. Bresler, 398 U.S. 6, 11, 90 S.Ct. 1537, 26 L. Ed.2d 6 (1970). See also, instances of special scrutiny of district court findings by courts of appeals, Guzich v. Drebus, 431 F.2d 594, 599 (6th Cir. 1970), cert. den. 401 U.S. 948, 91 S.Ct. 941, 28 L.Ed. 2d 231 ("questions of constitutional magnitude"); United States v. Baker, 364 F.2d 107, (3rd Cir. 1966), ("constitutional rights"); Caldwell v. Craighead, 432 F.2d 213, 224 dissenting opinion (6th Cir. 1970) cert. den. 402 U.S. 953, 91 S.Ct. 1617, 29 L.Ed.2d 123 ("First and Fourteenth Amendment issues")
 
 
 [6]
 364 U.S. 339, 346, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960)
 
 
 [7]
 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)
 
 
 [8]
 Whitcomb v. Chavis, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971)
 
 
 [9]
 See definition of the noun "race", and synonyms, Webster's Third New International Dictionary
 
 
 [10]
 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964)
 
 
 [11]
 Supra, fn. 8
 
 
 [12]
 P. 149 of 403 U.S., p. 1872 of 91 S.Ct. If Whitcomb has any guidance for us on the fundamental problem in this case, it is that plaintiffs, in order to be successful, must show that in drawing ward lines, choices were made with the purpose of diluting the voting strength of a particular racial or ethnic group, should they desire to exercise it as a group
 
 
 [13]
 1970 census figures on the number of negro residents were not available at the time of trial, and it was pretty clear that the 1960 census figures on that subject were not meaningful. Plaintiffs produced testimony tending to show that the actual 1970 percentage for Chicago was 38 to 40%, and that for various reasons the census tends to count fewer black persons than are actually present. We have relied on the census figures on race which have become available while the appeal was pending, and conclude that in further proceedings they should control so far as they are material. In reapportionment litigation, and where the equality of size of districts is the issue, we think that most recent official census figures are not to be impeached. In litigation like the present we think that where the census purports to state an accurate figure on race or similar grouping essential to the claims, the census figures should not be impeached except by extraordinarily compelling proof that other figures are more accurate
 
 
 [14]
 People v. Thompson, supra, fn. 4
 
 
 [15]
 319 F. Supp. at 1230
 
 
 [16]
 379 U.S. 433, 439, 85 S.Ct. 498, 13 L. Ed.2d 401 (1965), quoted in Burns v. Richardson, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966)
 
 
 [17]
 WMCA v. Lomenzo, 238 F. Supp. 916, 925 (S.D.N.Y.1965), aff'd per curiam, 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2 (1965)
 
 
 [18]
 382 U.S. at p. 6, 86 S.Ct. at p. 26
 
 
 [19]
 Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636, 1972
 
 
 [20]
 Norwalk CORE v. Norwalk Redevelopment Agency, 2 Cir., 395 F.2d 920, 937
 
 
 [1]
 The American Peoples Encyclopedia (1961 ed.) Vol. 9, p.538
 
 
 [2]
 Mr. Justice Frankfurter, in his dissent in Baker v. Carr, 369 U.S. 186, 266, 82 S.Ct. 691, 7 L.Ed.2d 663, characterized the Court's decision in that case as "a massive repudiation of the experience of our whole past," id. at 267, 82 S.Ct. at 737, and asserted that the Court had reversed "a uniform course of decision established by a dozen cases," id. at 266, 82 S.Ct. at 737
 
 
 [3]
 The case was argued on October 18-19, 1960, and decided on November 14, 1960. Mr. Justice Douglas joined the opinion of Mr. Justice Frankfurter while adhering to his own dissents in prior cases, 364 U.S. at 348, 81 S.Ct. 125, and Mr. Justice Whittaker concurred on a separate ground, id. at 349
 
 
 [4]
 Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, was first argued on April 19-20, 1961, although not decided until after reargument in the following Term
 
 
 [5]
 See 369 U.S. at 192, note 13, 82 S.Ct. at 697. About one-third of the population elected about two-thirds of the members of both branches of the state legislature. See Mr. Justice Clark's concurring opinion at 253, 82 S.Ct. 691
 
 
 [6]
 In Finding 19 the district court stated, in part, that the record "demonstrates that the sole basis for the shaping and formation of the wards in the City of Chicago drawn at those public hearings was the then available federal census data. . . ." (Plaintiffs' Appendix 853) (Emphasis added.) Finding 32 states: "There is no evidence that the Defendant City Council of Chicago, in enacting the 1970 ordinance reapportioning the wards of Chicago, intended to dilute or debase the vote of the black population of Chicago, or that of any other ethnic or religious group." (Plaintiffs' Appendix 856-7) (Emphasis added.)
 
 
 [7]
 See 364 U.S. at 349, 81 S.Ct. 125
 
 
 [8]
 See 364 U.S. at 348, 81 S.Ct. 125. Mr. Justice Douglas adhered to the dissents in Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, and South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834
 
 
 [9]
 "This is not a case in which a State has, through a device however oblique and sophisticated, denied Negroes or Jews or redheaded persons a vote, or given them only a third or a sixth of a vote. That was Gomillion v. Lightfoot, 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110]." Baker v. Carr, 369 U.S. 186, 300, 82 S.Ct. 691, 755, 7 L. Ed.2d 663 (Mr. Justice Frankfurter dissenting)
 
 
 [10]
 "There has been no hesitation in striking down those contrivances that can fairly be said to infringe on Fourteenth Amendment rights. . . . Gomillion v. Lightfoot, 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] (1960); . . ." Whitcomb v. Chavis, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363
 
 
 [11]
 Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 1408, 31 L. Ed.2d 768 (dissenting opinion) (1972)
 
 
 [12]
 The Whitcomb Court's discussion on pages 153-156, 91 S.Ct. 1858 suggests that the Court would apply the same analysis to charges of political discrimination as to charges of racial discrimination. At page 156, 91 S.Ct. at page 1875, the Court indicates that one of the reasons for the rejection of the district court's holding was an unwillingness to accept the result of the application of that holding to other identifiable groups:
 "The District Court's holding, although on the facts of this case limited to guaranteeing one racial group representation, is not easily contained. It is expressive of the more general proposition that any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a singlemember district. This approach would make it difficult to reject claims of Democrats, Republicans, or members of any political organization in Marion County who live in what would be safe districts in a single-member district system but who in one year or another, or year after year, are submerged in a one-sided multi-member district vote. There are also union oriented workers, the university community, religious or ethnic groups occupying identifiable areas of our heterogeneous cities and urban areas. Indeed, it would be difficult for a great many, if not most, multi-member districts to survive analysis under the District Court's view unless combined with some voting arrangement such as proportional representation or cumulative voting aimed at providing representation for minority parties or interests. At the very least, affirmance of the District Court would spawn endless litigation concerning the multi-member district systems now widely employed in this country."
 While the Court was considering a multimember district problem in Whitcomb, that case is not thereby irrelevant to the case before us. If the Equal Protection Clause requires that discrimination on the basis of race, politics, religion, or economic status must be placed in one category for purposes of evaluating the constitutionality of a multi-member district plan, that Clause could hardly permit the setting up of different categories merely because single-member rather than multi-member districting was being evaluated. Whitcomb involved two challenges to the districting plan: (1) allegations of inequities resulting from differences in the ultimate weight of an individual vote from a multi-member as opposed to a single-member district on the legislature's decision on a particular issue-a modified "numerical disparity" challenge, and (2) allegations that the Marion County district "illegally minimizes and cancels out the voting power of a cognizable racial minority in Marion County," 403 U.S. at 144, 91 S.Ct. at 1869. The Court's discussion of the first issue does not, of course, have any direct bearing on the present case. The constitutional analysis of the second issue, however, seems as applicable to single-member as to multi-member districts. The Court held that the impact of the districting plan on the Negro Center Township Ghetto-an impact which appears to be much more severe than anything involved in this case (see note 35, infra)-did not constitute invidious discrimination.
 
 
 [13]
 In Gray v. Sanders, 372 U.S. 368, 379, 83 S.Ct. 801, 808, 9 L.Ed.2d 821, the Court wrote:
 "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote- whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment." (Emphasis added.)
 
 
 [14]
 The gerrymander attacked in Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512, illustrates how identification of the distinction between the individual's right and the group's interest in having its political strength remain "undiluted" may lead to opposite conclusions. The exclusion of whites from the 18th District protected Congressman Powell's supporters from dilution of their voting power. The gerrymander was therefore defended by black political leaders. If feasible, a random, unsegregated distribution of black and Puerto Rican voters, which constituted 37.7 percent of Manhattan's total, might have given the whites a majority in all four of Manhattan's congressional districts. Under Mr. Justice Douglas's analysis, respect for the individual would clearly justify such a result notwithstanding its dilution of group political strength:
 "Here the individual is important, not his race, his creed, or his color. The principle of equality is at war with the notion that District A must be represented by a Negro, as it is with the notion that District B must be represented by a Caucasian, District C by a Jew, District D by a Catholic, and so on. Cf. Gray v. Sanders, 372 U.S. 368, 379 [83 S.Ct. 801, 807-808, 9 L. Ed.2d 821]. The racial electoral register system weights votes along one racial line more heavily than it does other votes. That system, by whatever name it is called, is a divisive force in a community, emphasizing differences between candidates and voters that are irrelevant in the constitutional sense." 376 U.S. at 66, 84 S.Ct. at 611.
 See also Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506. The Court there wrote:
 "A predominant consideration in determining whether a State's legislative apportionment scheme constitutes an invidious discrimination violative of rights asserted under the Equal Protection Clause is that the rights allegedly impaired are individual and personal in nature." Id. at 561, 84 S.Ct. at 1381.
 
 
 [15]
 E.g., Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759
 
 
 [16]
 E.g., Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L. Ed.2d 481; Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506
 
 
 [17]
 When the gerrymander takes the form of numerical disparities among districts, there is, of course, a more direct impact on the individual right to vote. But the worst examples of gerrymandering might well occur even with numerical equality. As Mr. Justice Harlan noted in his dissent in Wells v. Rockefeller, 394 U.S. 542, 551, 89 S.Ct. 1234, 1240, 22 L.Ed. 2d 535 "The fact of the matter is that the rule of absolute equality is perfectly compatible with 'gerrymandering' of the worst sort. A computer may grind out district lines which can totally frustrate the popular will on an overwhelming number of critical issues." Or, as Mr. Justice White said dissenting in the same case, id. at 555, 89 S.Ct. at 1242:
 "Today's decisions on the one hand require precise adherence to admittedly inexact census figures, and on the other downgrade a restraint on a far greater potential threat to equality of representation, the gerrymander. Legislatures intent on minimizing the representation of selected political or racial groups are invited to ignore political boundaries and compact districts so long as they adhere to population equality among districts using standards which we know and they know are sometimes quite incorrect. I see little merit in such a confusion of priorities."
 
 
 [18]
 It cannot be contended that political gerrymandering has senior status that entitles it to immunity from judicial scrutiny. Unhappily, we must candidly acknowledge the existence of racial discrimination as a part of our American heritage since well before Governor Gerry signed the Declaration of Independence or conceived of the salamander as a ghetto for Federalists. That such discrimination existed is evident-if any authority be needed-from the fact that the Framers of the Constitution provided, in Article I, Section 2, that some persons would be counted as only three-fifths of a person for purposes of allocating representatives among the States
 
 
 [19]
 The Federalists were the target of the districting plan attributed to Governor Gerry in 1812
 
 
 [20]
 See Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24
 
 
 [21]
 See Pontikes v. Kusper, 345 F.Supp. 1104 (N.D.Ill., 1972) (decided together with Klaetsch v. Stern)
 
 
 [22]
 Shakman v. Democratic Organization of Cook County, 435 F.2d 267 (7th Cir. 1970), cert. denied, 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650; Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1, clearly recognizes "independents" as a cognizable political group. See id. at 819, 89 S.Ct. 1493
 
 
 [23]
 Moreover, in Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512, none of the Supreme Court Justices, and indeed none of the district court judges, even suggested that simple answer to the problem presented by that case
 
 
 [24]
 Or, of course, I may be wrong in rejecting the distinction between racial and political gerrymandering. See Judge Sprecher's thoughtful opinion in Grivetti v. Illinois State Electoral Board, 335 F. Supp. 779, 789 (N.D.Ill.1971), affirmed, 406 U.S. 913, 92 S.Ct. 1772, 32 L.Ed. 2d 113 (1972). He wrote:
 "In the present state of federal reapportionment law, it is inconceivable that a state-sponsored plan with nearabsolute equality could be considered constitutionally infirm, with the possible exception of one incorporating flagrant racial gerrymandering. [Citing Gomillion]."
 I would agree with his statement if the word "racial" were deleted from it. If the Republicans in Tuskegee, Alabama, all lived in one neighborhood and if the Legislature of Alabama had enacted a law redefining the boundaries of the city so as to exclude, by means of an uncouth twenty-eight-sided figure, all Republicans from the city, I am confident the Supreme Court would find the act constitutionally infirm.
 
 
 [25]
 One element of Whitcomb involved a complicated mathematical analysis tending to indicate that, as to ultimate decisions made by the legislature, an individual vote in a multi-member district might have more "weight" than an individual vote in a single-member district. The Court did not, however, consider its "mathematical equality" standard violated by this difference in ultimate "weight." Since the Court proceeded to consider the other element of the case, see note 12, supra, it is difficult to conclude that mere satisfaction of the mathematical standard would render a districting plan immune from constitutional attack. In the many reapportionment cases decided by the Court, it has neither squarely accepted nor squarely rejected mathematical equality as the sole test in all reapportionment cases. Some district court cases have viewed mathematical equality as the sole test where political gerrymandering is at issue, but have taken a different approach where racial gerrymandering is alleged. See WMCA, Inc. v. Lomenzo, 238 F.Supp. 916, 926 (S.D.N.Y.1965). The Supreme Court affirmed summarily, 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2. Mr. Justice Harlan concurred on the basis that the case involved partisan gerrymandering, which he viewed as nonjusticiable. Subsequently, however, a case alleging a "systematic and intentional partisan gerrymander" arose in Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535, and the Court said specifically, at 544, 89 S.Ct. at 1236, "We do not reach, and intimate no view upon the merits of, the attack upon the statute as a constitutionally impermissible gerrymander." On remand the district court assumed the justiciability of the political gerrymander issue, but found plaintiff's evidence insufficient. 311 F.Supp. 48, 53 (S.D. N.Y.1970), affirmed 398 U.S. 901, 90 S.Ct. 1696, 26 L.Ed.2d 60. As I read Judge Cannella's separate opinion, although he considers the process by which a legislature draws boundary lines to be nonjusticiable, he would recognize the propriety of judicial review of the results of districting which produced "crazy quilts, completely lacking in rationality," or "other wild district configurations," see especially 311 F.Supp. at 56-57. See also other cases cited in the text of Judge Fairchild's opinion following note 18
 
 
 [26]
 "If these allegations upon a trial remained uncontradicted or unqualified, the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration, that the legislation is solely concerned with segregating white and colored voters by fencing Negro citizens out of town so as to deprive them of their preexisting municipal vote." 364 U.S. 339, at 341, 81 S.Ct. 125, at 127. (Emphasis added.)
 
 
 [27]
 This appears to be the test which both Judge Feinberg and Judge Murphy applied (with different conclusions on the facts) in Wright v. Rockefeller. See 211 F.Supp. 460, 468-471, 471-475
 
 
 [28]
 There is some ambiguity in the opinions of Justices Douglas and Goldberg in Wright v. Rockefeller because they imply agreement with the standard applied by Judges Feinberg and Murphy, see 376 U.S. at 59, 84 S.Ct. at 607 ("[W]here, as here, the line that is drawn can be explained only in racial terms, a different problem is presented." (Emphasis added.)), at 61 and at 71-72, 84 S.Ct. at 613-614, but I believe their opinions, fairly read, would condemn any reliance on race as "a criterion" in districting. See, e.g.:
 "At least, however, appellants' proof made it appear probable that a racial criterion shaped the 1961 reapportionment and that an inference of reliance on such impermissible criterion was more reasonable than an inference that other factors alone had been used. . . . The simple answer is that appellees made no attempt whatever to rebut the inference that race was a criterion in-or racial segregation a purpose of-the districting." 376 U.S. at 72-73, 84 S.Ct. at 614.
 "In the absence of such proof by the State, I am compelled to conclude that racial segregation was a criterion in - or a purpose of-the districting of New York's Seventeenth and Eighteenth Congressional Districts." Id. at 74, 84 S.Ct. at 615.
 
 
 [29]
 That few grounds, if any, exist to justify a deviation from mathematical equality is apparent from Mr. Justice Brennan's rejection of numerous alternatives in Kirkpatrick v. Preisler, 394 U.S. 526, 533-536, 89 S.Ct. 1225, 22 L.Ed.2d 519. See also Mr. Justice Harlan's list of ten impermissible considerations which he had discerned in the Court's opinions through Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, which he set forth in his dissent in that case. Id. at 622-623, 84 S.Ct. 1362. It does not follow, of course, that just because certain considerations may not provide a rational or permissible justification for deviation from the requirement of strict mathematical equality, that such considerations are also irrational or impermissible justifications for a redistricting plan when it is attacked on grounds other than numerical disparity. A numerical standard is relatively manageable. Outside the numerical disparity category, the difficulty of establishing judicially manageable standards necessarily indicates the need for giving legislatures some greater leeway in redistricting
 
 
 [30]
 Indeed, the same "group interest" might simultaneously support and oppose the concentration of black voters in a single district
 "As the majority below pointed out, the concentration of colored and Puerto Rican voters in one area in the county made it difficult, even assuming it to be permissible, to fix districts so as to have anything like an equal division of these voters among the districts. Undoubtedly some of these voters, as shown by this lawsuit, would prefer a more even distribution of minority groups among the four congressional districts, but others, like the intervenors in this case, would argue strenuously that the kind of districts for which appellants contended would be undesirable and, because based on race or place of origin, would themselves be unconstitutional." Wright v. Rockefeller, 376 U.S. 52, 57-58, 84 S.Ct. 603, 606, 11 L.Ed.2d 512.
 My reading of the several opinions in Wright persuades me that the majority would not apply the strict standard as espoused by Justices Douglas and Goldberg (see note 28, supra) to a gerrymandering case; under that standard, the "findings" of two members of the three-judge district court were just as "clearly erroneous" as those entered by the district judge in this case.
 However, it should be noted that Mr. Justice Douglas, in his dissent, clearly expressed his attitude toward the conflicting interests indicated by the above quotation from the majority opinion. He would apparently oppose a classification intended to promote a group interest in matters relating to the characteristic which makes the group an identifiable one. He wrote, 376 U.S. at 67, 84 S.Ct. at 611:
 "When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan. Since that system is at war with the democratic ideal, it should find no footing here."
 Any attempt to redraw districting lines for the purpose of maximizing the number of districts in which black voters would have a majority would, it appears, be inconsistent with Mr. Justice Douglas's approach. His approach affords maximum respect to the individual citizen. He assumes that democracy is best served when individuals vote their individual convictions on political issues rather than vote "for" or "against" their "group." We show disrespect for the dignity to which every man is entitled in the eyes of the law if we do not presume that every individual votes his own convictions rather than merely voting "for" his group. See text preceding note 19, supra.
 
 
 [31]
 The paucity of meaningful discussion in the record of the Council proceedings before us suggests that this is what happened here, possibly because the pending litigation had a "chilling effect" on forthright discussion in the Council chambers
 
 
 [32]
 Or conversely, invalid legislation might be saved by the absence of evidence of improper motivation. See Mr. Justice Goldberg's discussion of Judge Moore's opinion, Wright v. Rockefeller, 376 U.S. 52, 68, 73, 84 S.Ct. 603, 11 L.Ed.2d 512
 
 
 [33]
 Proper respect for the legislative process need not, of course, foreclose judicial identification of its weaknesses or its failures. See, e.g., Groppi v. Leslie, 436 F.2d 331 (7th Cir. 1971), dissenting opinion at 335, reversed, 404 U.S. 496, 92 S.Ct. 582, 30 L.Ed.2d 632
 
 
 [34]
 The underlying basis for the legislative privilege is worth remembering. In its brief amicus curiae in the Supreme Court in United States v. Gravel, 405 U.S. 916, 92 S.Ct. 963, 30 L.Ed.2d 785, 1971, the United States Senate stated:
 "For not only must the privilege protect a Senator from efforts of the Executive to question his speech, it must, if it is to be meaningful, prevent the Executive from acting in such a way as to inhibit a Senator's use of his aides. To isolate a Senator so that he cannot call upon the advice, counsel, and knowledge of his personal assistants is to stop him from functioning as an independent legislator. If an aide must fear that the advice he offers, the knowledge he has, and the assistance he gives to his Senator may be called into question by the Executive, then he is likely to refrain from acting on those very occasions when the issues are the most controversial and when the Senator is most in need of assistance. If the aide must fear that a vindictive Executive or hostile Judiciary will seek to strike at him because it cannot reach his Senator, then the aide will not be able to give his best service to his superior. And the Senator will never be certain whether the advice he gets and the assistance he receives are not the product of the caution and fear engendered by the threats implied. In order that the Senator be protected from Executive interference, the Executive cannot be permitted to delve into what passes between the Senator and his aide." (pp. 12-13)
 
 
 [35]
 The district court in Whitcomb found:
 "The Negro Center Township Ghetto population is sufficient in size to elect approximately two members of the House of Representatives and approximately one senator if these were specific single-member legislative districts within Marion County." Chavis v. Whitcomb, 305 F.Supp. 1364, 1385 (S.D.Ind. 1969).
 The district court identified the community of interests of the Center Township Ghetto and explained why the representatives elected at large in the multimember district did not in fact and would not represent these interests. The district court concluded that the facts established that the multi-member district system resulted in a "minimization of the voting strength" of the defined group and prevented "responsive and effective legislative representation of the described Ghetto voters, though they are numerically large." Id. at 1386. The district court thus concluded that the districting plan operated "to minimize and cancel out the voting strength of a minority racial group." Id. at 1385.
 The Supreme Court held that the facts as found did not constitute a deprivation of the equal protection of the laws. The Court wrote:
 "Nor does the fact that the number of ghetto residents who were legislators was not in proportion to ghetto population satisfactorily prove invidious discrimination absent evidence and findings that ghetto residents had less opportunity than did other Marion County residents to participate in the political processes and to elect legislators of their choice. We have discovered nothing in the record or in the court's findings indicating that poor Negroes were not allowed to register or vote, to choose the political party they desired to support, to participate in its affairs or to be equally represented on those occasions when legislative candidates were chosen." 403 U.S. 124 at 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363.
 "The mere fact that one interest group or another concerned with the outcome of Marion County elections has found itself outvoted and without legislative seats of its own provides no basis for invoking constitutional remedies where, as here, there is no indication that this segment of the population is being denied access to the political system." Id. at 154-155, 91 S.Ct. at 1875.
 This language is, of course, directly applicable to the record before us.
 
 
 [36]
 Cf. Cassell v. Texas, 339 U.S. 282, 286-287, 70 S.Ct. 629, 94 L.Ed. 839
 
 
 [37]
 Ferrell v. Hall, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972), affirming, Ferrell v. Oklahoma ex rel. Hall, 339 F. Supp. 73 (W.D.Okl., 1972). See also the quotation from Whitcomb in note 12, supra
 
 
 [38]
 "It is plain to us that the District Court was not compelled to find that these districts were the product of a state contrivance to discriminate against colored or Puerto Rican voters." 376 U.S. at 57, 84 S.Ct. at 606
 "We accept the District Court's finding that appellants have not shown that the challenged part of the New York Act was the product of a state contrivance to segregate on the basis of race or place of origin." Id. at 58, 84 S.Ct. at 606.
 
 
 [39]
 "But there is no suggestion here that Marion County's multi-member district, or similar districts throughout the State, were conceived or operated as purposeful devices to further racial or economic discrimination." 403 U.S. at 149, 91 S.Ct. at 1872
 
 
 [40]
 See Palmer v. Thompson, 403 U.S. at 242-243, 91 S.Ct. 1940, 29 L.Ed.2d 438
 
 
 [41]
 When the question is the number of persons to be represented by each representative, the Supreme Court's decisions (e.g., those cited in note 16, supra, and Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519) have made it perfectly clear that the only valid state objective is numerical equality and that any other ground will be presumed to be wholly irrelevant to that purpose unless the state establishes a "compelling" justification. See note 29, supra
 
 
 [42]
 Parenthetically, I should observe that "compactness," or the nearest practical approximation thereto, even if judicially manageable, does not even arguably provide a standard for interpretation of the Equal Protection Clause. Plaintiffs do not contend otherwise. They rely on lack of compactness as (1) a violation of Illinois law, and (2) evidence of discrimination. The Supreme Court has discounted the importance of geographical compactness. See Kirkpatrick v. Preisler, 394 U.S. 526, 535-536, 89 S.Ct. 1225, 22 L.Ed.2d 519. The basis for the requirement of numerical equality is the individual voter's right to have his vote counted equally with that of every other citizen voting in the same election. The shape of the election district does not itself affect the individual voter. There is no federal constitutional right to vote in a compact election district. When there is an effect on the individual's voting right, such as denying him the right to vote for even a limited time, the state must present a "compelling" justification. Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972)
 
 
 [43]
 Although Yick Wo v. Hopkins, is famous for its statement of legal principles, a few salient facts made the outcome of the litigation inevitable:
 "And while this consent of the supervisors is withheld from them, and from 200 others who have also petitioned, all of whom happen to be Chinese subjects, 80 others, not Chinese subjects, are permitted to carry on the same business under similar conditions." 118 U.S. 356, 374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220.
 
 
 [44]
 It is of interest to note, however, that the gerrymander which coined the name for this invidious practice was also described as "uncouth" and enabled 50,164 Democrats to elect 29 representatives as opposed to only 11 elected by 51,766 Federalists. That uncouth result was much more flagrant than anything suggested by this record and was promptly cured by a political remedy. See Encyclopedia Brittanica (11th Edition, 1911), Vol. 11, p. 904
 
 
 [45]
 One of plaintiffs' experts, Pierre DeVise, testified, in part:
 "A. I do not think that race was a major consideration. I think that the major consideration was probably the retention of the old wards. . . . I would look upon the retention of the old wards with all of the kinds of pressure, including racial consideration that went into these wards, [as] the major determination of what the new wards were like." Plaintiffs' Appendix 188-190.
 
 
 [46]
 In any reapportionment, the most logical starting point is existing boundaries. They need be varied only to the extent necessary to achieve numerical equality. Stability is maintained and election mechanics are simplified when most of the people continue to vote at the same polling place in the same district. The fact that the multi-member district in Whitcomb v. Chavis was designed to avoid splitting up Marion County into separate districts was apparently regarded by the Supreme Court as sufficient justification for the lack of representation in fact of the interests of a cognizable group of voters. See note 35, supra